UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

MARK WINKLE,

    Plaintiff,

vs.

EDISON LEARNING, INC.,

    Defendant.

Case No. 3:19-cv-242

District Judge Michael J. Newman

---

**ORDER: (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 41); (2) DISMISSING WITH PREJUDICE PLAINTIFF'S COMPLAINT (DOC. NO. 2); AND (3) TERMINATING THIS CASE ON THE DOCKET**

---

This case is before the Court on Defendant Edison Learning, Inc's summary judgment motion. Doc. No. 41. Plaintiff Mark Winkle filed an opposition memorandum and Edison Learning replied. Doc. Nos. 46, 49. This matter is ripe for review.[1]

## I. Undisputed Facts

Winkle—a Caucasian male who was fifty-nine years old at the filing of his complaint—returned to college in 2010 to become an English teacher. Doc. No. 2 at PageID 24; Doc. No. 35 at PageID 196; Doc. No. 35-1 at PageID 299. He spent several years substitute teaching for Dayton-area public schools but never secured a permanent position there because, in his view, those schools "didn't want to hire men." Doc. No. 35 at PageID 199. After Winkle's first full-time teaching contract was not renewed after the 2015-2016 school year, he filed a race, sex, age, and religion discrimination complaint against the school with the Ohio Civil Rights Commission

---

[1] Winkle originally filed his complaint in the Montgomery County, Ohio Court of Common Pleas. Doc. No. 1-3. Edison Learning timely removed the case to this Court. Doc. No. 1. Edison Learning is a Delaware corporation with its principal place of business in Florida. *Id.* at PageID 2. Winkle is an Ohio resident. *Id.* Therefore, this Court has diversity of citizenship jurisdiction over this case. 28 U.S.C. § 1332.

("OCRC"). Doc. No. 36-1 at PageID 518–25. The OCRC could not substantiate his claims. *Id.* at PageID 526.

Out of a job, Winkle applied for an English teaching position at the recently-opened Bridgescape Academy—Dayton ("Bridgescape"). Doc. No. 39 at PageID 863–64. Operated by Edison Learning, Bridgescape provides a high school education to students at risk of, or who have, dropped out of the traditional school system. *Id.* Edison Learning's Student Success Director and Superintendent of Ohio Schools Gamal Brown—an African American male—was responsible for staffing Bridgescape. *Id.* at PageID 863. In August 2016, Brown hired Winkle as the English teacher and Adam Callahan, a Caucasian male, to teach math. *Id.* at PageID 864. Brown named D'Juana McAtee, an African American female, as principal. *Id.*

Winkle and McAtee's relationship started off poor and, according to Winkle, never improved. Doc. No. 35 at PageID 202–03, 207. The two met at an Edison Learning training session. *Id.* at PageID 202. Winkle overheard someone ask McAtee where her staff was, prompting McAtee to point at Winkle, allegedly saying, "all we have is that old white guy sitting over there." *Id.* at PageID 203. Winkle never confronted McAtee nor told anyone at Edison Learning about her comments. *Id.*

As the school year started, Winkle found McAtee to be "rude," "condescending," and volatile. Doc. No. 35 at PageID 207–08. Winkle alleges that McAtee often screamed at the students, threw objects, and berated her staff, including Winkle, in front of their students. *Id.* at PageID 208, 232, 238. Winkle recalled two instances, between October and December 2016, where he allegedly overheard McAtee tell another staff member "that old man has got to go." *Id.* at PageID 244.

Winkle felt micromanaged by McAtee, too.  To ensure students were completing their assignments, McAtee directed Winkle to complete fifteen-minute progress reports on his students and turn them into her each week.  *Id.* at PageID 240; Doc. No. 36-1 at PageID 486.  Winkle was overwhelmed by this added responsibility.  Doc. No. 35 at PageID 240–41; Doc. No. 35-1 at PageID 371–72.  He came to believe that McAtee only assigned him the progress reports to harm his performance.  Doc. No. 35 at PageID 215, 239–40; Doc. No. 35-1 at PageID 371–72.

Winkle also believed McAtee to be racially biased.  Doc. No. 2 at PageID 26; Doc. No. 35 at PageID 221.  One day in October 2016, a fifteen-year-old African American boy was being particularly disruptive during class.  Doc. No. 35 at PageID 210–11.  Winkle asked him to stop bothering the other students, to which the boy retorted, "I'll do what I want to do" and "if I ever catch you outside of here, me and my boys will deal with you."  *Id.* at PageID 211.  Alarmed and fearing for his safety, Winkle retreated to his classroom to write a report on, and tell McAtee, what happened.  *Id.*  McAtee was gone, so Winkle emailed a complaint to the Dayton Police Department.  *Id.*; Doc. No. 35-1 at Page 319.  He explained to the police that the boy threatened him with physical violence and that he was "willing to prosecute . . . on the charge of aggravated menacing."  *Id.*  Winkle provided the police with the boy's full name, physical description, address, and mother's contact information.  *Id.*  He later testified that he hoped the police would arrest the boy.  Doc. No. 35 at PageID 214.  When they declined to do so, Winkle petitioned a Montgomery County, Ohio magistrate judge for a restraining order against the boy because he feared bodily harm.  Doc. No. 35-1 at PageID 338.  The judge denied his request.  *Id.*

Winkle alerted McAtee to the situation by forwarding her the email he sent to the police department.  Doc. No. 35-1 at PageID 318.  McAtee immediately informed Brown and Edison Learning's human resources department.  Doc. No. 38 at PageID 860.  McAtee was concerned that

3

Winkle violated the boy's Family Educational Rights and Privacy Act of 1974 ("FERPA") rights. *Id.* Winkle expressed the next day on a conference call with McAtee and a human resources representative that he "was threatened with bodily harm and that [he] feared for [his] safety as well as the safety of [his] students." Doc. No. 35 at PageID 217–18. Edison Learning placed Winkle on paid, non-disciplinary administrative leave while they investigated the incident. Doc. No. 35-1 at PageID 330.

Winkle felt he was being retaliated against for reporting the boy, even though a human resources representative clarified the leave was to ensure his safety. Doc. No. 35 at PageID 225; Doc. No. 35-1 at PageID 337. Winkle believed McAtee was behind the administrative-leave decision. Doc. No. 35 at PageID 211. According to Winkle, McAtee knew the boy's mother and wanted to keep him in school. *Id.* McAtee allegedly called Winkle into a meeting following their conference call and pressured him to drop the charges. *Id.* Winkle believed that, had he been African American, McAtee would have taken the police report in "stride" and not reported him to human resources. *Id.* at PageID 222.

Winkle would not lose his job for several more months. In February 2017, one of Winkle's students left his classroom to tell another staff member that Winkle was asleep at his desk. Doc. No. 36-1 at PageID 492; Doc. No. 37 at PageID 857. The student showed the staff member a video she posted to YouTube that depicted Winkle sitting with his legs stretched out in front of him, arms crossed, chin on his chest, and eyes closed. Doc. No. 36-1 at PageID 492; Doc. No. 37 at PageID 857. The staff member entered the classroom, saw Winkle asleep, and startled him awake when she placed her hand on his shoulder. Doc. No. 37 at PageID 857. Winkle said he was just "resting his eyes." Doc. No. 35 at PageID 414. The student later told McAtee she took the video

4

because "[Winkle] shouldn't have been asleep on the job and it wasn't fair that everyone else was working." Doc. No. 38 at PageID 861.

McAtee informed Brown, who was concerned about the reputational damage the video could cause Bridgescape. Doc. No. 39 at PageID 865. Brown consulted Vice President of Strategic Human Resources, Cynthia Gonzalez, and the two concluded that Winkle violated Edison Learning's policy prohibiting "[l]oitering, loafing or sleeping during work hours." *Id.*; *see also* Doc. No. 36-1 at PageID 496. Brown fired Winkle the next day. Doc. No. 36 at PageID 415; Doc. No. 36-1 at PageID 500–01; Doc. No. 39 at PageID 865. Winkle's vacancy was not filled until the next school year when Edison Learning hired a forty-year-old African American female. Doc. No. 39 at PageID 865.

Winkle filed a five-count complaint against Edison Learning in the Montgomery County Court of Common Pleas that was timely and properly removed to this Court. Doc. Nos. 1, 2. United States District Judge Thomas M. Rose—to whom this case was previously assigned—dismissed three of Winkle's claims. Doc. No. 13. Edison Learning now moves for summary judgment on Winkle's remaining claims of reverse race discrimination, Ohio Rev. Code § 4112.02(A), and age discrimination claims, Ohio Rev. Code § 4112.14(A). Doc. No. 41.

## II. Summary Judgment Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). The moving party must either point to "particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B). A court considering a motion for summary judgment must view the facts and all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. Analysis

Winkle's reverse race and age discrimination claims fail as a matter of law.[2] He advances no evidence that would allow a reasonable jury to reject Brown's honest belief he fired Winkle because he was sleeping during class. Nor can Winkle sustain his age discrimination claim on McAtee's "old white guy" comments when it was Brown, not McAtee, that fired him, and nothing in the record suggests that Brown held ageist views. Edison Learning, therefore, is entitled to summary judgment.

### A. Reverse Race Discrimination

Winkle relies on indirect evidence, and the *McDonnell Douglas* burden-shifting standard, to prove his reverse discrimination claim. Doc. No. 46 at PageID 901–03; *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). To demonstrate a *prima facie* case of reverse discrimination, a plaintiff must show that he or she (1) "is a member of a protected class"; (2) "was qualified for the job";

---

[2] "Ohio's [racial discrimination] requirements are the same as under federal law," *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (quotation omitted), and so "[f]ederal case law interpreting Title VII applies to cases involving alleged violations of Chapter 4112 of the Ohio Revised Code," *Morris v. Fam. Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 339 (6th Cir. 2009) (citation omitted). The same is true of age discrimination claims. *See Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 289 (6th Cir. 2012) ("Age discrimination claims brought under the Ohio statute are analyzed under the same standards as federal claims brought under the ADEA" (quotation omitted) (cleaned up)).

(3) "suffered an adverse employment decision"; and (4) "was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) (quoting *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001)). "The Sixth Circuit has adapted this four-prong test to cases of reverse discrimination, where a member of the majority is claiming discrimination." *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004) (quoting *Sutherland v. Mich. Dep't of Treas.*, 344 F.3d 603, 614–15 (6th Cir. 2003)). "In such cases, a plaintiff satisfies the first prong of the *prima facie* case by 'demonstrating background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Id.* (cleaned up) (quoting *Sutherland*, 344 F.3d at 614). "To satisfy the fourth prong in a reverse-discrimination case, the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class." *Id.*

Proving the *prima facie* case shifts the burden of production to the employer to articulate "legitimate, nondiscriminatory reasons for the adverse employment action." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020). If the employer demonstrates a "clear and reasonably specific" nondiscriminatory justification, the plaintiff faces the burden to prove the given explanation was pretext for discrimination. *Tx. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258 (1981). Proof that the employer's stated rationale was not the real reason for the adverse employment action allows the factfinder to infer discriminatory intent. *See Miles*, 946 F.3d at 887–88. But "[a]s long as the employer held an honest belief in its proffered reason, 'the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless.'" *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285–86 (6th Cir. 2012) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)).

1. *Prima Facie* **Case**

Winkle sufficiently alleges a *prima facie* case of reverse race discrimination. Edison Learning concedes Winkle was qualified for the job, it fired him, and replaced him with an African American. Doc. No. 41 at PageID 870–82. The "mere fact" that Brown, the ultimate decision-maker, is African American satisfies the background circumstances prong. *See Arendale*, 519 F.3d at 603 ("Sixth Circuit precedent suggests, in the context of reverse discrimination claims, that the mere fact that an adverse employment decision was made by a member of a racial minority is sufficient to establish the first prong of the prima facie case" (citing *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 257 (6th Cir. 2002))); *see also Nelson v. Ball Corp.*, 656 F. App'x 131, 136–37 (6th Cir. 2016) (collecting cases).

2. **Non-Discriminatory Reason, Pretext, and Honest Belief**

Edison Learning asserts Brown fired Winkle because he was sleeping in class in violation of employee policy. Doc. No. 41 at PageID 883. This is a legitimate, non-discriminatory rationale. *See, e.g.*, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 392 (6th Cir. 2008) (explaining that a legitimate, non-discriminatory rational must be "clear and reasonably specific" and "arguably supported by 'admissible evidence which would allow the trier of fact rationally to conclude that the employment decision [was] not motivated by discriminatory animus'" (quoting *Burdine*, 450 U.S. at 257–58)). The burden shifts back to Winkle to show pretext.

"[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Romans v. Mich. Dep't of Hum. Servs.*, 668 F.3d 826, 839 (6th Cir. 2010) (quoting *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). Winkle believes that the police report he filed against his student, not that he fell asleep in class, prompted his firing. Doc. No. 35 at PageID 211, 221–22. He insists that McAtee

8

only reported him to human resources because he is Caucasian and that this led to his termination. *Id.* Winkle's theory, however, is refuted by the undisputed record.

Consider first that Winkle made the police report in October 2016, nearly four months prior to his termination. Doc. No. 35-1 at PageID 321; Doc. No. 36-1 at PageID 500. Neither McAtee nor human resources disciplined Winkle for doing so. Doc. No. 35-1 at PageID 337; Doc. No. 38 at PageID 860. Rather, he was placed on paid, non-disciplinary leave for his own safety and was allowed to return to school when he felt comfortable. Doc. No. 35 at PageID 228; Doc. No. 35-1 at PageID 337. Nothing in the record suggests anyone at Bridgescape (other than Winkle) brought up the incident again. Doc. No. 38 at PageID 860. Winkle, for his part, later learned that Edison Learning policy instructed that he was supposed to first alert McAtee to threats of student violence, not the police. Doc. No. 35 at PageID 222. If Edison Learning wanted to terminate Winkle for this incident, it would not have trained him on the proper reporting procedure, let alone allow him to return to work.

Had the police report played a role in Winkle's termination, it had nothing to do with his race. Winkle advances no evidence (other than his opinion) to suggest that McAtee, or anyone else in the Edison Learning administration, was biased against Caucasians. Doc. No. 35 at PageID 222. He claims that McAtee's reference to him as "white" evidences her prejudice. *Id.* at PageID 203, 222, 242. But this does not square with her treatment of Callahan. Winkle testified that Callahan was McAtee's "favorite" teacher and that they had a good relationship. Doc. No. 36 at PageID 419.

Assuming, *arguendo*, that McAtee was biased against Winkle, she was not involved in his termination. Brown fired him after consulting Gonzalez. Doc. No. 39 at PageID 865. Winkle identifies no evidence to suggest that Brown was biased against Caucasians. Doc. No. 46. No

9

reasonable jury could find otherwise. Brown hired and fired Winkle within a seven-month span. If Brown fired Winkle because he was Caucasian, he never would have hired him. *Cf. Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 801 (6th Cir. 2007) ("[W]here the same person hires the employee and fires him within a short period of time, especially where the employee's class has not changed, there is a strong contrary inference of discriminatory intent" (citing *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463–64 (6th Cir. 1995))).

Were Winkle able to establish pretext, he could not overcome Edison Learning's reliance on Brown's honest belief he fired Winkle for sleeping during class. "'[A]s long as an employer has an honest belief in its proffered non-discriminatory reason,' the employee cannot establish pretext simply because the reason is ultimately shown to be incorrect." *Tillman v. Ohio Bell Tel. Co.*, 545 F. App'x 340, 349 (6th Cir. 2013) (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)). "An employer's pre-termination investigation need not be perfect in order to pass muster under the rule." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 591 (6th Cir. 2014) (citation omitted). "And to rebut an employer's invocation of the rule, the plaintiff must offer some evidence of 'an error on the part of the employer that is too obvious to be unintentional.'" *Id.* (quoting *Seeger*, 681 F.3d at 286).

Brown came to believe that Winkle was sleeping during class after speaking with the staff member who roused him, the student who took the video, and McAtee, who viewed the video. Doc. No. 39 at PageID 864–65. Though Winkle claims he was just "resting his eyes," that does not undermine Brown's conclusion. Doc. No. 35 at PageID 414. Brown was reasonably concerned about the reputational harm Bridgescape could suffer if the public saw, and its students believed, its teachers sleep during class. Doc. No. 39 at PageID 865. Winkle does not advance any evidence to suggest that Brown did not honestly hold those concerns or believe that Winkle was asleep.

10

Edison Learning was, therefore, entitled to rely on Brown's justification for firing Winkle. *See, e.g.*, *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 587 (6th Cir. 2009) (noting a plaintiff's "own speculation . . . unsupported by any allegation of fact" that the employer knowingly violated their own policies "is not enough" to demonstrate pretext). Winkle's reverse race discrimination claim thus fails as a matter of law.

### B. Age Discrimination

Edison Learning is entitled to summary judgment on Winkle's age discrimination claim, too. The Age Discrimination in Employment Act ("ADEA") prohibits employers from making adverse employment decisions because of an employee's age. 29 U.S.C. § 623(a). "To prevail on a claim under the ADEA, it is not sufficient for the plaintiff to show that age was a motivating factor in the adverse action; rather, the ADEA's 'because of' language requires that a plaintiff 'prove . . . that age was the "but-for" cause of the challenged employer decision.'" *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir. 2014) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)).

Winkle claims that McAtee's "old white guy" comment and the two times she said "the old man has got to go" constitute direct evidence of discrimination. Doc. No. 35 at PageID 203, 244; Doc. No. 46 at PageID 904–05. "Direct evidence . . . proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) (citations omitted). Direct evidence of discrimination is "evidence of conduct or statements by persons involved in making the employment decision directly manifesting a discriminatory attitude, of a sufficient quantum and gravity that would allow the factfinder to conclude that attitude more likely than not was a motivating factor in the employment decision." *Scott v. Potter*, 182 F. App'x 521, 525–26 (6th Cir. 2006) (quoting *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 724 (8th Cir. 2001)).

>Several factors help courts determine whether an employer's comments evidence ageism:
>
>>(1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination.

*Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477–78 (6th Cir. 2002) (citing *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994)). "None of these factors is individually dispositive of age discrimination, but rather, they must be evaluated as a whole, taking all of the circumstances into account." *Id.* (citing *Cooley*, 25 F.3d at 1330).

A jury would have to make too many inferential leaps to find that McAtee's "old white guy" comments show that Winkle was fired because of his age. *Cf. Alberty v. Columbus Twp.*, 730 F. App'x 352, 356–57 (6th Cir. 2018) (explaining that remarks made with allegedly discriminatory intent must be "clear on [their] face" to constitute direct evidence). McAtee played no role in Winkle's termination. Rather, it was Brown, not McAtee, who fired Winkle. Doc. No. 38 at PageID 861; Doc. No. 39 at PageID 865. Nothing in the record, other than Winkle's opinion, suggests that McAtee had any influence over Brown's decision or that Brown solicited her opinion. *See, e.g.*, *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, --- F. 4th ---, 2022 WL 2965630, at *7 (6th Cir. July 27, 2022) ("Discriminatory remarks, however, are direct evidence of discrimination only when they come from a supervisor with at least a 'meaningful role in the decisionmaking process'" (quoting *Bartlett v. Gates*, 421 F. App'x 485, 489 (6th Cir. 2010))). Recall that it was Gonzalez, not McAtee, Brown consulted to determine whether Winkle violated Edison Learning policy. Doc. No. 39 at PageID 864–65.

Absent evidence a biased subordinate influenced the decisionmaker, "[a]ny discriminatory statements must come from decisionmakers to constitute evidence of discrimination." *Geiger v.*

12

*Tower Auto.*, 579 F.3d 614, 620–21 (6th Cir. 2009) (citation omitted). Winkle testified that he never heard Brown make any negative comments about his age, and he does not allege that Gonzalez made any ageist remarks either. Doc. No. 35 at PageID 244; Doc. No. 46. No reasonable factfinder would believe, considering Brown's swift reaction to the sleeping allegation, that Winkle would have kept his job but for McAtee's remarks. *See, e.g.*, *Hannon v. La.-Pac. Co.*, 784 F. App'x 444, 448 (6th Cir. 2019) ("[T]he sole question that matters [in employment discrimination cases is] [w]hether a reasonable juror could conclude that [the plaintiff] would have kept his job if he [was not in the protected class], and everything else had remained the same" (quoting *Ortiz v. Werner Enterprs., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016))). Winkle does not attempt to show age discrimination through indirect evidence, *see* Doc. No. 46; therefore, his claim fails as a matter of law.

## IV. Conclusion

Accordingly, the Court: (1) **GRANTS** Edison Learning's summary judgment motion (Doc. No. 41); (2) **DISMISSES WITH PREJUDICE** Winkle's complaint (Doc. No. 2); and (3) **TERMINATES** this case on the docket.

**IT IS SO ORDERED.**

Date:   August 18, 2022               s/Michael J. Newman
                                      Hon. Michael J. Newman
                                      United States District Judge